IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 07-147 |
| | : | |
| CARL OVERINGTON | : | |
| | : | |

<u>**MEMORANDUM AND ORDER**</u>

Kauffman, J.                                                                      October 24, 2007

On March 20, 2007, Defendant Carl Overington was charged by Indictment with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). On June 19, 2007, Defendant filed the instant Motion to Suppress Statements and Physical Evidence. On September 13, 2007, this Court held a suppression hearing, after which both parties filed supplemental briefs. For the reasons discussed below, Defendant's Motion will be denied.

**I. BACKGROUND**

On March 6, 2006, Philadelphia Police Officer Michael Bucchieri responded to a reported shooting in the area of Norwood and Church Streets in Philadelphia and was directed to Albert

Einstein Medical Center to meet with a victim.[1] Officer Bucchieri arrived at the hospital just after Defendant arrived in a car driven by Darnell Smith. Smith helped Defendant from the car into a wheelchair provided by hospital security. Officer Bucchieri could see that Defendant had been shot in the foot, and he patted Defendant down for security purposes. Defendant was unarmed, and hospital security wheeled him inside.

Officer Bucchieri remained outside with Smith. He asked Smith if he was armed, and Smith responded that there was a firearm in the car. When Officer Bucchieri patted down Smith, he recovered four jars of marijuana from Smith's person. He then arrested Smith and placed him inside his police car. After opening the rear passenger door of the vehicle Smith had driven to the hospital, Officer Bucchieri observed the butt of a gun sticking out from underneath the passenger seat. He recovered the weapon in order to secure the scene.

Officer Bucchieri, who was in uniform at the time, entered the hospital to speak with Defendant to obtain "flash information" about the shooting, including a description of the incident and the identities of the perpetrators. When Officer Bucchieri entered the trauma room, the hospital staff already had started treating Defendant for his gunshot wound. There were no other police officers in the trauma room, but two uniformed police officers stood outside the door during Officer Bucchieri's brief conversation with Defendant. Officer Bucchieri did not handcuff Defendant or otherwise restrain him because he did not consider him to be in police custody. During the brief conversation, Defendant told Officer Bucchieri that unknown males in a green vehicle had shot him. After this discussion, Officer Bucchieri went outside to transmit the

---

[1] The facts presented are based on the testimony of witnesses at the suppression hearing and the Court's credibility determinations of those witnesses.

information to other police units in the area. Officer Bucchieri told the officers standing outside the trauma room to monitor Defendant's location so police would be able to locate him if he were transferred to another hospital room.

Detectives Steve Grace and Bill Knecht arrived shortly after Officer Bucchieri's conversation with Defendant. Detective Grace remained outside with Officer Bucchieri in order to inspect the vehicle in which Defendant had arrived. Detective Knecht went inside the hospital to obtain information about the shooting. Although Detective Knecht was aware that a firearm had been recovered from the vehicle, he testified at the suppression hearing that he thought the weapon belonged to Smith, who had been arrested and placed in the back of Officer Bucchieri's patrol car.

When Detective Knecht entered the trauma room, there were no other police officers in the room. An unknown number of hospital workers were treating Defendant. Detective Knecht introduced himself to Defendant and began asking questions. During the questioning, Detective Knecht recorded the questions and answers on an investigation form. See Investigation Interview Record (hereinafter "Interview Record"), attached to Resp. to Mot. to Supp. at Ex. A.[2] Detective Knecht recorded each question and response before moving on to the next question. Defendant signed the bottom of each page of the Interview Record after the interview ended.[3]

---

[2] The first three pages of the Interview Record were made while Detective Knecht interviewed Defendant at the hospital. The fourth page of the Interview Record was made the following day, when Detective Grace asked Defendant additional questions after Defendant's arrest.

[3] Defendant does not dispute that he signed each page of the Interview Record, but at the suppression hearing, he testified that the detectives inserted answers into the Record that he did not provide. He also acknowledged that he lied about answers to specific questions, and that he made up other answers "[o]ut of thin air." Hr'g Tr. 171.

At the time of this interview, Detective Knecht was not in uniform and his firearm was concealed beneath his suit jacket. He did not place Defendant in handcuffs or attempt to physically restrain him. Detective Knecht testified that Defendant understood all of his questions and was aware of his surroundings. He described Defendant's demeanor during the interview as very cooperative. Detective Knecht did not administer Miranda warnings before beginning the interview.

Detective Knecht first asked Defendant what happened, and when he explained that a man came from behind and shot him, Detective Knecht asked about the man, the gun he had used, and whether Defendant saw a car before the shooting. Five questions into the interview, Detective Knecht asked Defendant, "Did you have a gun?" Interview Record 2. According to Detective Knecht, he routinely asks this question of shooting victims in Philadelphia. Defendant answered in the affirmative and volunteered that he had fired his gun twice at the assailant. He added that the gun in question was the gun in the car outside the hospital. Detective Knecht asked two more questions about the shooting and then paused the interview to administer Miranda warnings. He read the warnings from a card, and after he was finished, Defendant orally agreed to waive his rights and continue the interview. Once Defendant waived his rights, Detective Knecht continued asking questions, obtaining more information about the shooting. Defendant made further incriminating statements, explaining how and why he acquired the firearm, and also admitted that he had marijuana in the trunk of his car. The interview lasted approximately 20 minutes.

When Detective Knecht began speaking with Defendant at 2:36 p.m., he had received six

milligrams of morphine, which was administered by intravenous drip starting at 2:22 p.m.[4]  After the interview, Defendant received a second dose of four milligrams at 3:00 p.m.  According to a nurse who treated Defendant, he was evaluated as a level 15 (the highest possible score) on the Glasgow Coma Scale, which is a neurological scale used by doctors as a means of recording and evaluating the conscious state of a patient.  The attending nurse testified that Defendant was communicative and spoke with hospital staff without confusion.  She testified that when he was brought into the trauma room, he was moaning and indicating that he was in severe pain.

After the interview with Detective Knecht, Defendant was placed under arrest, and when he was discharged from the hospital at approximately 7:00 p.m. that evening, he was released into police custody.  Later that evening, police officers executed a warrant to search the car outside the hospital and recovered approximately one-quarter pound of marijuana from the trunk.

The following day, when Defendant was in his cell awaiting arraignment, Detective Grace asked him additional questions.  Before doing so, Detective Grace asked Defendant whether he understood the Miranda warnings Detective Knecht had given him in the hospital.  After Defendant assured Detective Grace that he understood those rights, Detective Grace proceeded with the interview.  This interview was recorded and attached to Defendant's statement from March 6, 2006.  Defendant also signed the bottom of this page after the interview ended.

---

[4] Detective Knecht testified that he was unaware that Defendant had been given morphine and explained that "if [Defendant's] speech was slurred or he was acting in a way that I thought he was under the influence of some type of drug then we probably just would have stopped." Hr'g Tr. 65.

**II. DISCUSSION**

Defendant claims that because he was not given <u>Miranda</u> warnings prior to police questioning, any evidence against him was obtained in violation of his federal constitutional rights. The Government contends that Defendant was neither in police custody nor subject to interrogation, and accordingly, Detective Knecht was not required to administer <u>Miranda</u> warnings.

In order to determine whether <u>Miranda</u> warnings were necessary, the Court must perform a two-step analysis. First, the Court must determine whether Defendant was "in custody." If the Court finds that he was in custody, it must then decide whether he was subjected to "interrogation." <u>See, e.g.</u>, <u>Alston v. Redman</u>, 34 F.3d 1237, 1244 (3d Cir. 1994) ("Because the presence of *both* a custodial setting and official interrogation is required to trigger the <u>Miranda</u> right-to-counsel prophylactic, absent one or the other, <u>Miranda</u> is not implicated.").

**A. Custody**

As the Supreme Court has explained, "police officers are not required to administer <u>Miranda</u> warnings to everyone whom they question." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977). Rather, "<u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" <u>Id.</u>; <u>see</u> also <u>United States v. Leese</u>, 176 F.3d 740, 743 (3d Cir. 1999) ("Under controlling law, <u>Miranda</u> warnings are required only when a person has been deprived of his or her freedom in some significant way."). "[T]he ultimate inquiry is: 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" <u>Leese</u>, 176 F.3d at 743 (internal quotation marks omitted) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)). The determination of whether a

suspect is in custody is "an objective inquiry (that is, what a reasonable person would believe) based on the circumstances of the interrogation." United States v. Jacobs, 431 F.3d 99, 105 (3d Cir. 1995) (citing Leese, 176 F.3d at 743); see also Stansbury v. California, 511 U.S. 318, 323 (1994) ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). The general test is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). In cases where a person is restrained for reasons unrelated to police conduct, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Government argues that based on the totality of the circumstances in the instant case, Defendant was not "in custody" for Miranda purposes. The Third Circuit has recognized a number of factors relevant to the "in custody" inquiry: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006). Another relevant factor is "whether the officer revealed his or her belief that the suspect was guilty." Jacobs, 431 F.3d at 105.

1. **Under Arrest or Free to Leave**

Although a statement that Defendant was not under arrest and was not required to answer

questions would have clarified the situation, "such a statement, while helpful to determine the custodial nature of the interrogation, is not required to render an interrogation non-custodial." Reinert v. Larkins, 379 F.3d 76, 86 (3d Cir. 2004); see also United States v. Hynson, 2007 U.S. Dist. LEXIS 67261, at *9 (E.D. Pa. Sept. 11, 2007) (finding that a suspect was not in custody despite the fact that the interrogating officer "had not stated whether [the defendant] was under arrest or free to leave").

### 2. Location and Circumstances of the Interview

The interview took place in a hospital, rather than the coercive atmosphere of a police station. Defendant voluntarily entered the hospital as the victim of a possible crime, and any restraint on his freedom of movement was for medical rather than investigative purposes. See Wilson v. Coon, 808 F.2d 688, 690 (8th Cir. 1987) (finding that the defendant was not in custody when physically restrained by medical personnel at the scene of an accident because "[d]etention for a medical examination is not a situation that a reasonable person would find inherently coercive in the sense required by Miranda"). The fact that other officers were present investigating the shooting and monitoring the location of the victim does not render the setting coercive, especially when the testimony indicates that hospital personnel were attending to Defendant during the questioning, thereby reducing any potential for police domination. See Berkemer v. McCarty, 468 U.S. 420, 438 (1984) ("[E]xposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [suspect's] fear that, if he does not cooperate, he will be subjected to abuse."). Indeed, courts have found that victims in similar circumstances were not "in custody" merely because they were interviewed by police in a hospital setting. See, e.g., Gren v.

Greiner, 89 F. App'x 754, 757 (2d Cir. 2004) (finding that the state courts were not unreasonable in finding no custody where, *inter alia*, a single police officer asked "a limited number of questions" of a hospitalized defendant, conducted an investigatory rather than accusatory line of questioning, and did not handcuff the suspect); United States v. Caldwell, 1995 U.S. Dist. LEXIS 10868, at *12 (E.D. Pa. Aug. 1, 1995) (finding no custody where, *inter alia*, the defendant had checked himself into the hospital for treatment of a gunshot wound and where officers questioned him in the hospital room without restraining him), aff'd mem., 116 F.3d 470 (3d Cir. 1997); People v. Mosley, 87 Cal. Rptr. 2d 325, 331-32 (Cal. Ct. App. 1999) (finding no custody where a gunshot victim was interviewed by police officers in an ambulance en route to the hospital because, *inter alia*, the officers "did not know what had happened that caused [the victim] to be shot" and did not restrain or threaten the victim).

### 3. Duration of the Interview

The interview in this case lasted only twenty minutes. The brief duration clearly favors a finding that the interview was not custodial. See, e.g., United States v. Little, 2007 U.S. Dist. LEXIS 46201, at *12 (E.D. Pa. June 26, 2007) (finding that a suspect was not in custody where "he was never restrained or threatened," "[h]e was never told he had to answer questions or that he couldn't leave," and "[t]he entire interview lasted only two hours").

### 4. Coercive Tactics

Detective Knecht did not use coercive tactics during the interview. He testified that he used a calm, professional tone of voice, did not draw or display his concealed firearm, and did not restrain Defendant in any way. The lack of coercion supports a finding that Defendant was not in custody when questioned by Detective Knecht. See, e.g., Hynson, 2007 U.S. Dist. LEXIS

67261, at *9 (finding that a defendant was not in custody where, *inter alia*, the investigating officer did not restrain the suspect, use a hostile tone, or employ any other coercive tactics); United States v. Kofsky, 2007 U.S. Dist. LEXIS 64161, at *78 (E.D. Pa. Aug. 28, 2007) (same); Little, 2007 U.S. Dist. LEXIS 46201, at *12 (finding no custody where, *inter alia*, the defendant "was never restrained or threatened").

### 5. Voluntary Submission to Questioning

Defendant, who has had several previous contacts with the criminal justice system, voluntarily submitted to police questioning in the hospital. Defendant also agreed to sign each page of the statement. While Defendant was wounded and complaining of pain during his time in the trauma room, all witnesses who testified stated that he understood his surroundings and responded coherently to questions. Despite Defendant's injury, at no time did he ask Detective Knecht to stop the interview, nor is there any indication that Detective Knecht would have refused to do so if asked. Absent any evidence of police coercion, Defendant's argument that he did not agree to speak voluntarily with the officers—a decision that led to his confession—must fail. See Colorado v. Connelly, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."); Leese, 176 F.3d at 744 ("There is nothing in the record to suggest that the inspectors would not have departed on request or allowed [the defendant] to do so. Once this point is passed, little remains.").[5]

---

[5] In the context of determining whether a Miranda waiver was voluntary, numerous courts have found waivers valid despite the fact that a defendant had received pain medication. See, e.g., United States v. Morris, 287 F.3d 985, 989 (10th Cir. 2002) (finding a waiver valid where a defendant "had been shot twice . . . had been on heavy pain medication immediately after the shooting, and . . . had little contact with the outside world while in the hospital" because

### 6. Indicia of Suspicion

As the Supreme Court has explained, "[a]n officer's knowledge or beliefs [about a suspect's guilt] may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." Stansbury, 511 U.S. at 325. The relevant question is whether the officer's manifestation of suspicion "would have affected how a reasonable person in that position would perceive his or her freedom to leave." Id. At the suppression hearing, Detective Knecht indicated that at the time he interviewed Defendant, he was aware that a firearm had been recovered, but thought the weapon belonged to Smith. He also indicated that he did not know whether Defendant was merely the victim of a crime or a victim and a criminal suspect. While Defendant was not ruled out as a potential criminal suspect, Detective Knecht did not approach the interview with any concrete suspicion that Defendant had been involved criminally in the shooting, nor did he express any such suspicion to Defendant before beginning the interview. Given the totality of the circumstances described above, a reasonable person in Defendant's situation "would have felt free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 438. Accordingly, Defendant was not "in custody," and Detective Knecht was not required to provide Miranda warnings before beginning his questions.

---

there was no proof of FBI agent misconduct); United States v. Byrne, 83 F.3d 984, 989 (8th Cir. 1996) (upholding a waiver despite evidence that the defendant was under the influence of methadone because the interrogating officer stated that the defendant "was coherent, composed and cooperative, although somewhat subdued, during the interrogation"); United States v. George, 987 F.2d 1428, 1430 (9th Cir. 1993) ("[A] defendant can voluntarily waive his Miranda rights even when he is in the hospital, on medication, and in pain."). Because the standards for a voluntary Miranda waiver and a voluntary statement are the same, see Connelly, 479 U.S. at 169-70, these decisions provide further support for the conclusion that Defendant voluntarily agreed to provide statements to Detective Knecht.

### B. Interrogation

Because the Court finds that Defendant was not "in custody" for Miranda purposes, it need not reach the issue of whether Defendant was subjected to "interrogation." See, e.g., Alston, 34 F.3d at 1244.

### III. CONCLUSION

For the reasons discussed above, Defendant's Motion is denied. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 07-147** |
| | : | |
| **CARL OVERINGTON** | : | |

## ORDER

AND NOW, this 24th day of October, 2007, upon consideration of Defendant's Motion to Suppress Statements and Physical Evidence (docket no. 10), the Government's Response thereto (docket no. 15), the Government's Supplemental Response thereto (docket no. 21), and Defendant's Supplemental Brief in Support of Motion to Suppress (docket no. 22), and after an evidentiary hearing on September 13, 2007, it is **ORDERED** that the Motion is **DENIED**.

BY THE COURT:

/s/ Bruce W. Kauffman
**BRUCE W. KAUFFMAN, J.**